IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

BRANDON D'ARCY
*On behalf of himself and those similarly situated*,

    *Plaintiff*,

vs.

ESSENTIAL SERVICES INTERMEDIATE
HOLDING CORPORATION D/B/A
TURNPOINT SERVICES; HUNTER
SUPER TECHS SERVICE
CORPORATION;
DOE CORPORATION 1-25;
JOHN DOE 1-25,

    *Defendants*.

Case No. 6:22-cv-00144-EFM

**MEMORANDUM AND ORDER**

    Before the Court is Defendant Essential Services Intermediate Holding Corporation d/b/a TurnPoint Services[1] ("TurnPoint")'s Motion to Dismiss Plaintiff Brandon D'Arcy's claims against it for lack of personal jurisdiction. Plaintiff has brought claims for violation of the Fair Labor Standards Act ("FLSA") and for recovery of unpaid wages under the Oklahoma Protection of

---

[1] This case originally named TurnPoint as "Doe Corporation d/b/a/ TurnPoint Services," as reflected in the case heading. TurnPoint first identified itself as "Essential Services Intermediate Holding Corporation d/b/a/ TurnPoint Services" in its Motion to Dismiss.

Labor Act ("OPLA").  Plaintiff also seeks to bring a collective class action on behalf of similarly situated individuals.  For the reasons stated below, the Court grants TurnPoint's Motion.

## I. Factual and Procedural Background[2]

Plaintiff is an Oklahoma resident who works for Defendant Hunter Super Techs Services Corporation ("Hunter") as an HVAC technician.  Hunter is a Delaware corporation with its principal place of business in Oklahoma which provides hearing, ventilation, air conditioning, plumbing, and electrical services to customers in Oklahoma and Texas.  TurnPoint is a holding company incorporated in Delaware with its principal place of business in Kentucky.  It created Hunter as an independent, wholly-owned subsidiary in 2018 to acquire the assets of a preexisting business, Hunter Heat & Air, LLC.  Following the merger, the general manager and most of Hunter Heat & Air, LLC's employees continued working for Hunter, maintaining essentially the same employment and payroll practices that existed under the previous corporation.

TurnPoint has no control over the day-to-day activities of Hunter's technicians.  Neither does TurnPoint set or negotiate pay or work schedules or determine the manner in which Hunter's technicians, including Plaintiff, are paid.  TurnPoint does, however, provide Hunter access to a Kronos software payroll system, which Hunter administers on its own.  For a time, paystubs from this system listed TurnPoint at the bottom instead of Hunter.  This was a system error detected and corrected in April 2022.  TurnPoint requires Hunter's technicians to complete NexStar, a training

---

[2] The following facts are taken from Plaintiff's Complaint and considered true except when controverted by affidavit.  In the case of conflicting affidavits, the Court resolves all factual disputes in Plaintiff's favor.

resource, provides advertising for Hunter,[3] and regularly sends an executive to visit Hunter's main office.

The main issue of this case is Hunter's implementation of its "piece-rate" pay policy. Under this policy, technicians are paid a percentage of the customer price of the services they provide—namely 17% of each job completed. This results in situations where technicians work more than 40 hours a week without receiving overtime compensation, despite allegedly being nonexempt employees entitled to overtime under the FLSA. Plaintiff also alleges that Hunter failed to abide by the terms of its contract, paying technicians as little as 6% of a job, as well as reducing wages whenever technicians brought along a helper.

Plaintiff brought suit against both Hunter and TurnPoint on May 10, 2022, claiming they had jointly violated the FLSA and the OPLA and seeking to initiate a class action on behalf of other technicians employed by Hunter. Soon after, TurnPoint moved to dismiss all claims against it for lack of personal jurisdiction. In support of its Motion, TurnPoint submitted the affidavit of Daniel Godbey, TurnPoint's CFO. Godbey averred that TurnPoint had no control over Plaintiff's policies, training, direction of its technicians' day-to-day activities, and was not involved in Hunter's pay policies or administration of its payroll at all.[4] In response, Plaintiff submitted his own affidavit, stating that he regularly witnessed a TurnPoint executive visit Hunter's office and that TurnPoint's name appeared on company policies and other documents on Hunter's company

---

[3] Plaintiff avers that TurnPoint required NexStar training and provided advertising for Hunter—or at least he avers that Hunter's regional supervisor told him TurnPoint did those things. Hunter's CFO submits his own affidavit wherein he avers that NexStar training is not required by TurnPoint, but rather is a training implemented by Hunter alone. Likewise, the regional supervisor avers that TurnPoint does not provide advertising for Hunter. However, at this stage, the Court must resolve all factual disputes in favor of Plaintiff, and TurnPoint raises no hearsay objection to Plaintiff's statement.

[4] TurnPoint also submitted two affidavits in its Reply, controverting some of Plaintiff's averments and further detailing the ways in which TurnPoint lacks control over Hunter and its employees.

app. Plaintiff also averred, "I was told by individuals who worked for Hunter Heat & Air, LLC prior to the sale of the company to TurnPoint Services, that employees were paid on an hourly basis and that TurnPoint Services implemented the piece-rate pay policy when it created Hunter Super Techs."

## II. Legal Standard

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move for dismissal of any claim where the court lacks personal jurisdiction over that defendant. A plaintiff opposing a motion to dismiss based on a lack of personal jurisdiction bears the burden of showing that jurisdiction over the defendant is appropriate.[5] "Where, as in the present case, there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists."[6] Once the plaintiff makes that showing, the defendant "must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.' "[7]

"[O]nly the well pled facts of [the] plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true"[8]—and even then, only to the extent they are uncontroverted by the defendant's affidavits.[9] "If the parties present conflicting affidavits, all

---

[5] *Fox v. Cal. Franchise Tax Bd.*, 443 F. App'x 354, 359 (10th Cir. 2011).

[6] *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)

[7] *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

[8] *Wenz*, 55 F.3d at 1505.

[9] *Shrader v. Biddinger*, 633 F.3d 1235, 1248 (10th Cir.2011).

factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[10]

### III. Analysis

**A.     Overview of personal jurisdiction law**

At issue before the Court is whether it may exercise personal jurisdiction over TurnPoint as a defendant in this case. Federal courts determine whether personal jurisdiction exists over parties based on the law of the forum state and due process.[11] Courts must therefore ask "(1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process."[12] "Oklahoma's long-arm statute authorizes courts to 'exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States.' "[13] Because "[n]either party raises any objection based on the Oklahoma constitution[,] the analysis collapses into a single due process inquiry."[14]

Under the due process analysis, personal jurisdiction may take the form of either general or specific jurisdiction over a defendant.[15] Only specific jurisdiction is at issue in the present case,

---

[10] *Wenz*, 44 F.3d at 1505 (further citations and quotations omitted).

[11] *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228 (10th Cir. 2020).

[12] *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006) (further citation and quotations omitted).

[13] *Dental Dynamics*, 946 F.3d at 1229 (quoting Okla. Stat. Ann., tit. 12, § 2004(F)).

[14] *Id.*

[15] *See Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017).

as neither party contends that the Court has general jurisdiction over Defendants.[16]  "Specific jurisdiction . . . allows a court to exercise jurisdiction over an out-of-state defendant only for claims related to the defendant's contacts with the forum State."[17]

For a court to exercise specific jurisdiction over a defendant, that defendant must have "purposefully established minimum contacts within the forum State."[18]  To determine whether minimum contacts exist for a defendant, courts must examine: "(1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the plaintiff's injury arose from those purposefully directed activities; and (3) whether exercising jurisdiction would offend traditional notions of fair play and substantial justice."[19]  Before reaching whether TurnPoint itself is subject to personal jurisdiction, however, the Court will address whether it should disregard the corporate veil between TurnPoint and Hunger.

## B. Circumstances do not justify disregarding TurnPoint's and Hunter's separate legal identities.

"For purposes of personal jurisdiction, a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity."[20]  "Circumstances justify disregard of the corporate

---

[16] *See Dental Dynamics,* 946 F.3d at 1228, n.2 ("Because Dental Dynamics advances no arguments in favor of general personal jurisdiction, we treat specific personal jurisdiction as the only variant at issue.").

[17] *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020).

[18] *C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319, 1322 (10th Cir. 2019) (quoting *Burger King*, 471 U.S. at 476) (further citation and quotations omitted).

[19] *Compañía de Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1281 (10th Cir. 2020) (further citation and quotations omitted).

[20] *Good v. Fuji Fire & Marine Ins. Co.*, 271 F. App'x 756, 759 (10th Cir. 2008) (further citation and quotations omitted).

entity if separation of the two entities has not been maintained and injustice would occur to third parties if the separate entity were recognized."[21]

TurnPoint raises the possibility that either Oklahoma, Delaware, or federal common law may apply to this "alter ego" issue.[22] However, in the context of personal jurisdiction, "the Tenth Circuit refers generally to the law of the forum state."[23] Therefore, the Court see no reason why Oklahoma law would not apply here, and indeed, TurnPoint makes no argument to the contrary. For his part, Plaintiff fails to cite *any* legal standard, thus waiving the issue of which law applies. Accordingly, the Court will employ Oklahoma law to analyze whether piercing the corporate veil is warranted here.

Under Oklahoma law, courts may consider up to nine factors when analyzing whether a subsidiary is the parent's alter ego.[24] However, "the primary consideration is the level of control exercised by the parent over the subsidiary."[25] Therefore, the question becomes whether there is "proof of pervasive control by the parent over the subsidiary more than what is ordinarily exercised

---

[21] *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974).

[22] *See Lazy S Ranch Properties, LLC v. Valero Energy Corp.*, 2020 WL 12813746, at *3 (E.D. Okla. 2020) ("Terminology is not always consistently used. The Tenth Circuit refers to the 'alter ego' doctrine regarding personal jurisdiction. *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004).").

[23] *Id.* (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)).

[24] *See Harris v. Am. Int'l Grp., Inc.*, 923 F. Supp. 2d 1299, 1305 (W.D. Okla. 2013) (listing potential factors as: "(1) whether the dominant corporation owns or subscribes to all the subservient corporation's stock, (2) whether the dominant and subservient corporations have common directors and officers, (3) whether the dominant corporation provides financing to the subservient corporation, (4) whether the subservient corporation is grossly undercapitalized, (5) whether the dominant corporation pays the salaries, expenses or losses of the subservient corporation, (6) whether most of the subservient corporation's business is with the dominant corporation or the subservient corporation's assets were conveyed from the dominant corporation, (7) whether the dominant corporation refers to the subservient corporation as a division or department, (8) whether the subservient corporation's officers or directors follow the dominant corporation's directions, and (9) whether the corporations observe the legal formalities for keeping the entities separate.") (further citation and quotations omitted).

[25] *Id.*

by a parent corporation."[26]  Under this factor, the plaintiff can establish alter ego by showing that the parent corporation "dominat[ed] the day to day business decisions" of its subsidiary.[27]

Here, Plaintiff fails to analyze any of the relevant factors except control in his attempt to show that Hunter is an alter ego of TurnPoint.  As to that factor, Plaintiff alleges in his Complaint that "Defendants" have substantial control over Hunter's technicians, the pay policies, and the terms and conditions of the technicians' work.  He also alleges that "Defendants maintained control over Plaintiff and similarly situated employees, including but not limited to, hiring firing, disciplining, recordkeeping, payroll, pay rates, deductions, and other practices."

Conversely, TurnPoint submits two affidavits by its CFO and one by Hunter's own regional supervisor stating that TurnPoint operates separately from Hunter, does not hire Hunter's employees or enforce Hunter's policies, and does not exercise any sort of control over Hunter's technicians, their day-to-day activities, their employment (i.e., hiring or firing), or the manner in which Hunter paid its technicians.  Rather, the declarants aver that Hunter alone hired, trained, and disciplined its employees, exercising full control over them.  Furthermore, Godbey avers that TurnPoint maintains a distinct legal identity from each of its subsidiaries, limiting its activities to branding, business development, and business coaching.

Plaintiff's own affidavit fails to contradict these statements.  He merely observes that a TurnPoint executive visits Hunter, TurnPoint mandates NexStar training, and TurnPoint provides advertising for Hunter.  At best, Plaintiff's averments constitute circumstantial evidence that TurnPoint oversees Hunter in ways typical of a parent corporation's relationship to its subsidiary.

---

[26] *Id.* (further citation and quotations omitted).

[27] *Quarles*, 504 F.2d at 1236.

They do not come anywhere near the level of showing that TurnPoint dominates Hunter's day-to-day business decisions as required by Oklahoma law to establish pervasive control. Therefore, the Court must continue to treat TurnPoint as a legal entity district from Hunter for the purpose of determining whether the Court may exercise personal jurisdiction over TurnPoint.

**C.    Because Plaintiff fails to show that his alleged injuries arise out of TurnPoint's purposefully directed activity, he cannot establish minimum contacts.**

The parties briefly argue the first element of minimum contacts, whether TurnPoint purposefully directed activities at Oklahoma residents. However, from their briefing it quickly becomes clear that the primary issue is not whether TurnPoint had any contacts with Oklahoma, but rather whether Plaintiff's injury arose from those contacts. The burden remains on Plaintiff to prove this element.

Plaintiff's arguments are all over the place. First, he admits that general jurisdiction does not exist over TurnPoint. Then he argues that TurnPoint's contacts with Oklahoma were "continuous and systematic," the very standard for finding general jurisdiction.[28] Second, he unequivocally states that this Motion "has nothing to do with 'piercing the corporate veil.' " Then Plaintiff argues that the "circumstances justify[] a disregard of the corporate entity." Last and certainly not least, Plaintiff wastes much time arguing that Defendant is liable as an employer under the FLSA. This argument is unavailing because Defendant has moved to dismiss on *jurisdictional* grounds—not liability. The Tenth Circuit has explicitly held that "[w]hether a

---

[28] *See Dudnikov*, 514 F.3d at 1078 (further citation and quotations omitted).

defendant would be liable under a statute if personal jurisdiction over it could be obtained is irrelevant to the question of whether such jurisdiction can be exercised."[29]

At no point does Plaintiff directly address the decisive issue in this case—whether his injuries arose out of the activities directed by TurnPoint at the state of Oklahoma.[30] It is here that Plaintiff's claim stands or falls. In this case, it falls. Because Plaintiff fails to meet the "arise out of" element for specific jurisdiction, the Court declines to address the other two.

Obviously, the specific requirement is "arise out of *or relate to*."[31] Addressing the latter part, the Supreme Court recently noted that "[n]one of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do."[32] Instead, it acknowledged that "[t]he first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing."[33] The Supreme Court declined to define what circumstances would suffice, despite noting "the phrase 'relate to' incorporates real limits."[34] Given the chance to interpret the meaning of "relate to" after the Supreme Court's holding in *Ford Motor Co.*, the Tenth Circuit held:

> We understand *Ford* to adopt the proposition that the forum State can exercise personal jurisdiction over an out-of-state defendant that has injured a resident plaintiff in the forum State if (1) the defendant has purposefully directed activity to market a product or service at residents of the forum State and (2) the plaintiff's

---

[29] *GCIU-Emp. Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 869–70 (10th Cir. 2017) (further citation and quotations omitted).

[30] *See GCIU-Emp. Ret. Fund v. Coleridge Fine Arts*, 808 F. App'x 655, 665 (10th Cir. 2020) ("The phrase 'arising out of or relating to' does not appear in the [plaintiff]'s issue headings, and the [plaintiff] did not present an organized 'causation' argument in its initial brief. By these omissions, the Fund forfeits any challenge to the district court's ruling on this ground.").

[31] *See Burger King*, 471 U.S. at 472 (emphasis added) (further citation and quotations omitted).

[32] *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).

[33] *Id.*

[34] *Id.*

claim arises from essentially the same type of activity, even if the activity that gave rise to the claim was not directed at forum residents.[35]

Notably, the limited scenario endorsed by the Tenth Circuit for when the phrase "relates to" suffices to establish personal jurisdiction is entirely dissimilar to the facts of the present case. Plaintiff makes no argument to the contrary. Therefore, the Court concludes that Plaintiff must rely on the "arise out of" part of the test to establish personal jurisdiction over TurnPoint. Thus, the test is one of causation, as addressed in the following section.

The Tenth Circuit has acknowledged that the "arise out of" requirement for specific jurisdiction has multiple interpretations.[36] In particular, two seem to be in common use: but-for causation and proximate cause.[37] In this context, but-for causation asks whether "any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction."[38] In contrast, the "considerably more restrictive" proximate cause approach "examines whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim."[39] However, the Tenth Circuit has yet to give a firm answer as to which applies in specific jurisdiction cases, despite consistently favoring the proximate cause standard in contract actions.[40]

---

[35] *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1224 (10th Cir. 2021).

[36] *See Compañía de Inversiones Mercantiles*, 970 F.3d at 1284.

[37] *See id.* at 1284–85. The Tenth Circuit has "rejected a 'third approach' which veers away from 'causation-based principles.' " *Id.* at 1285 (quoting *Dudnikov*, 514 F.3d at 1078); *see also Dudnikov*, 514 F.3d at 1078 ("Under this [third] theory, the relationship between the contacts and the suit can be weaker when the contacts themselves are more extensive.").

[38] *Dudnikov*, 514 F.3d at 1078.

[39] *Id.* (further citation, quotations, and brackets omitted).

[40] *See, e.g.*, *Compañía de Inversiones Mercantiles*, 970 F.3d at 1285.

Given the nature of Plaintiff's suit, the Court would be justified in employing the stricter proximate cause standard. Although not strictly a contract claim, Plaintiff's injury arises out of his contract with Hunter and, therefore, relates more closely to the line of Tenth Circuit cases applying proximate cause to personal jurisdiction challenges. However, there is no reason to determine which standard applies because Plaintiff cannot show that his claim either arises out of TurnPoint's activities purposefully directed at Oklahoma residents under either standard.[41]

Plaintiff brings two claims against Defendants: (1) violation of the FLSA through failure to pay proper overtime wages due to the piece-rate pay basis and (2) violation of the OPLA because of failure to timely pay overtime and wages agreed upon by the parties. Each of these claims stem from Hunter's implementation of its "piece-rate" pay policy. Therefore, the issue is whether TurnPoint caused Plaintiff's alleged injuries through somehow being a link in the causal chain sufficiently related to Hunter adopting the policy.

To controvert that theory, TurnPoint has presented an affidavit from its CFO Daniel Godbey stating that it did not negotiate pay or work schedules, enforce timekeeping policies, or administer Hunger's payroll. Even more importantly, "Turnpoint did not determine the manner in which D'Arcy or any other technician in Oklahoma was paid"—i.e., TurnPoint did not implement the piece-rate policy. If true, then Plaintiff's alleged injuries can hardly be caused by TurnPoint because Hunter alone was responsible for the piece-rate pay scheme.

In response, Plaintiff offers his own affidavit. However, the only information in Plaintiff's affidavit contradicting Godbey's averment is Plaintiff's statement that "I was told by individuals

---

[41] *See, e.g.*, *Compañía de Inversiones Mercantiles*, 970 F.3d at 1285 ("This court on several occasions has declined to choose between but-for and proximate causation, finding that neither test was outcome determinative given the facts at hand.").

who worked for Hunter Heat & Air, LLC prior to the sale of the company to TurnPoint Services, that employees were paid on an hourly basis and that TurnPoint Services implemented the piece-rate pay policy when it created Hunter Super Techs." TurnPoint objects to this statement as inadmissible hearsay.

Although courts usually address affidavits containing hearsay in the context of motions for summary judgment, the Tenth Circuit has held that Rule 56's standards "apply to affidavits submitted in support of or in opposition to motions to dismiss on jurisdictional grounds."[42] Specifically, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."[43] Accordingly, "courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form."[44]

Plaintiff's proffered statement by unidentified coworkers is the very definition of inadmissible hearsay.[45] No exception applies, a fact obvious from Plaintiff's vague reference to unidentified "individuals" as his source. Therefore, the Court will not consider this statement in ruling on TurnPoint's Motion.

---

[42] *Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 175 n. 6 (10th Cir. 1992).

[43] Fed. R. Civ. Proc. 56(c)(4); *see also Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) ("Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form. Nonetheless, the content or substance of the evidence must be admissible.") (further citations and quotations omitted).

[44] *Argo*, 452 F.3d at 1199.

[45] *See* Fed. R. Evid. 801 (defining hearsay as an out of court statement offered for the truth of the matter omitted); Fed. R. Evid 802 (excluding hearsay outside of any exception from the Court's consideration).

As it stands, the uncontroverted evidence establishes that TurnPoint had nothing to do with Hunter's decision to implement its piece-rate policy and its alleged failure to pay Plaintiff the wages owed under either the FLSA or the OPLA. Even though Hunter used TurnPoint's Kronos payroll system to pay Plaintiff, the decision to use the piece-rate pay policy was Hunter's alone. It is the policy—not the payroll system itself—that allegedly caused Plaintiff's injury. The payroll system is completely unrelated to Plaintiff's claims. Hunter could have just as easily implemented that policy via any other payroll system or even by issuing bad checks. Likewise, Hunter alone input and administered its payroll. Plaintiff offers no explanation as to how TurnPoint's payroll system is causally linked to Hunter's decision to implement the piece-rate pay system. Therefore, Plaintiff cannot establish that TurnPoint caused Plaintiff's injuries under either but-for causation or proximate cause. As such, Plaintiff cannot establish that his injuries arose out of TurnPoint's conduct, thereby failing to establish minimum contacts required for this Court to exercise specific jurisdiction over TurnPoint.

In sum, the Court lacks personal jurisdiction over TurnPoint. Accordingly, the Court grants TurnPoint's Motion to Dismiss.

**IT IS THEREFORE ORDERED** that TurnPoint's Motion to Dismiss for Lack of Jurisdiction (Doc. 18) is **GRANTED.**

**IT IS SO ORDERED.**

Dated this 21st day of February, 2023.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE